# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| JAMES MARTSOLF, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 6:16-cv-00348-NKL |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) |
| Defendant. | ) |

## ORDER

Plaintiff James Martsolf appeals the Commissioner of Social Security's final decision denying his application disability insurance benefits and supplemental security income under the Social Security Act. The decision is affirmed.

### I. Background

Martsolf was born in 1956. He alleges he became disabled beginning 12/31/2011. He last worked in an IT department as a help desk person until June 2007, when his contract expired. The Administrative Law Judge held a hearing on 12/18/2014 and denied his application on 1/15/2015. The Appeals Council denied his request for review on 2/19/2016.

#### A. Medical history

In December 2006, James Marx, D.O., diagnosed Martsolf with somatic dysfunction of the cervical spine. In March 2007, Martsolf was under stress and believed he was about to lose his job. He had high anxiety and severe neck and shoulder pain. Dr. Martsolf diagnosed somatic dysfunction, as well as generalized anxiety disorder. In May 2007, Martsolf reported that his neck and shoulder pain were worse with certain movements.

At a December 2008 visit, Dr. Marx recommended neck exercises.

In June 2009, Martsolf was continuing to use narcotic pain medications prescribed by Dr. Marx. He had high anxiety from job hunting.

In July 2010, Martsolf complained to Dr. Marx that he had cervical pain radiating into his arm. Dr. Marx found tenderness in the cervical muscles on the right and decreased range of motion. Diagnoses included degenerative disc disease of the cervical spine and generalized anxiety disorder. Dr. Marx prescribed OxyContin and Percocet, and ordered a neurosurgical consult. An August 2010 MRI showed cervical disc protrusion and desiccation, and straightening of the normal lordotic curve of the cervical spine.

At the visit with the neurosurgeon, John Gianano, M.D., in September 2010, Martsolf said he was not sure why he was there. He said he had no neck pain as long as he used his narcotic medication. He could mow his lawn and use a weed eater, and had no numbness, tingling, or weakness. Dr. Gianano noted Martsolf was on high doses of narcotics and recommended conservative treatment: anti-inflammatories, NSAIDs, and physical therapy.

Dr. Marx noted at a September 2010 follow up appointment that the neurosurgeon had not recommended surgery, or even steroid injections, but that Martsolf should continue medications. He also noted that Martsolf's anxiety levels were high at times. Diagnoses included degenerative disc disease of the cervical spine and generalized anxiety disorder.

Martsolf started seeing another primary care provider, Elaine Joselyn, D.O. in October 2010. He complained that he was treated like a drug addict when he went to an outpatient, pain management clinic at the Truman Medical Center, where he was told to use Advil and do neck exercises. He asked for refills to avoid running out and experiencing withdrawal. The doctor refilled his OxyContin and Percocet for one month. In November 2010 he requested a refill of OxyContin and hydrocodone, saying the medicine had given him his life back. He was given prescriptions and told to return the next month. In December 2010, he asked for Percocet to deal with break-through

2

pain, and suggested that he be given multiple months of refills. He was worried that his medication would not be refilled. The doctor gave him a new referral to a pain management clinic.

At a January 2011 follow up with Dr. Joselyn for prescription refills, Martsolf had no complaints, rated his pain at 0 out of 10, and said his pain was well controlled with OxyContin and Percocet. At visits over the next several months, the doctor tried adjusting Martsolf's narcotic medications to avoid development of tolerance, but in June 2011, the doctor prescribed OxyContin and Percocet. In early July 2011, Dr. Joselyn and Martsolf discussed the peaks and valleys of narcotic use. The doctor noted that Martsolf could turn his head more freely when not aware of what he was doing. Later the same month, Martsolf complained of sharp pain and gabapentin was added. Martsolf later admitted to the doctor's staff that he "over [did] it" and felt "stupid." Tr. 325. At a routine follow up at the end of July 2011, Martsolf asked for refills of OxyContin and Percocet, telling the doctor his pain was controlled with those medications. He had no other complaints.

Martsolf saw the doctor monthly from August 2011 through April 2012 for pain medication refills. His neck condition was stable. In May 2012, Martsolf told the doctor that he was doing better and had been more active, doing yard work and driving, among other activities. In June 2012, he told the doctor that his pain was controlled most days. At an August 2012 follow up, he reported that his pain was the same, but that his OcyContin only lasted 6 hours and he was waking up at night. The doctor continued OxyContin and instructed Martsolf to take Percocet in between OxyContin doses. His neck condition was stable in September and October 2012. His medications were refilled and he was referred to a pain management clinic. In November 2012, he complained that his pain was worsened by driving to the clinic, but he said his medication made the pain manageable.

His condition was stable from December 2012 through June 2013 and the doctor continued to renew his medications. He remarked at the March and April 2013 visits that his pain was well controlled. June 2013 was difficult for him due to family and financial problems. The doctor tried changing his OxyContin to morphine. Martsolf's financial and family issues were better by his July

3

2013 visit, but he said the morphine was not entirely effective, and that OxyContin and Percocet would control his pain well, and the doctor prescribed them. From August to September 2013, his pain medications were refilled and he worked to be approved for a program to cover his prescription costs. In October 2013, he complained of breakthrough pain and his doctor recommended adding a muscle relaxer, but he refused it. He complained of a flare up in November 2013. He had osteopathic manipulative therapy in December 2013 and was give refills of his pain medication. From January to April 2014, his condition was stable and the doctor continued to refill his prescriptions. In May 2014, he told Dr. Joselyn that his neck pain was exacerbated by driving to the appointment. He had limited bilateral range of motion in his neck. He saw the doctor in June 2014, reporting that he had used the weed eater the previous day and had arm pain. His medications were refilled. His condition was stable in July 2014.

In August 2014, Martsolf reported having withdrawal effects when waiting 8 hours to take his dose of slow-release OxyContin, and asked to be changed back to regular OxyContin, which the doctor did. His Percocet was decreased. His medications were refilled at monthly visits from September 2014 through December 2014. At his December 2014 visit, Dr. Joslyn noted Martsolf had a stiff neck and limited range of motion to the left and right.

### 2. Mental health treatment

Martsolf saw a psychiatrist, Innocent Anya, M.D., about every three or four months from April 2011 to November 2014, and the doctor prescribed and adjusted medications at the visits. In April 2011, Dr. Anya diagnosed depressive disorder and anxiety disorder. In November 2011, Dr. Anya noted Martsolf was stable. From August 2012 to May 2013, Martsolf complained of trouble sleeping and the doctor made medication adjustments. At his May 2013 and August 2013 visits, Martsolf complained of financial stressors and inability to afford insurance. Dr. Anya noted in November 2013 that Martsolf was stable. In February 2014, Martsolf reported that he was doing fine on his current medication, although he had run out of it because he had lost his insurance. Martsolf's

medications were adjusted in June and July 2014, and at an August 2014 visit, he reported that he was doing much better, and his medications were refilled. He reported a pretty good mood and that his anxiety was level at his November 2014 visit, and the doctor refilled his medications.

### B. Expert opinions

Dr. Altomari, a state agency psychologist, reviewed Martsolf's records and opined that Martsolf had no severe mental impairment. The ALJ gave Dr. Altomari's opinion significant weight, noting it was supported by Dr. Anya's treatment records which reflected Martsolf's symptoms were variable and responsive to treatment.

Kathryn Holmes, a single decision maker (SDM), also performed a physical residual functional capacity assessment. But the ALJ noted that an SDM is not considered a medical source and stated he therefore did not rely on Holmes' opinion. The ALJ stated that any similarities between the RFC and Holmes' opinion were due to the consistency of the evidence.

A vocational expert, Janice Hastert, testified at the hearing before the ALJ. The ALJ asked her to assume a hypothetical individual of Martsolf's age, education, and work history, who can lift 10 pounds occasionally or frequently; can stand about two hours a day and sit about six hours a day; can't do any work that involves climbing ladders, ropes and scaffolds; can't do work that involves crawling; could frequently balance; can occasionally climb ramps and stairs, stoop, kneel or crouch; should avoid concentrated exposure to vibration and hazardous conditions; and would be limited to no more than occasional pushing and pulling with the bilateral upper extremities. Hastert testified that such an individual could perform Martsolf's past work as an IT help desk worker. Hastert further testified that if the individual had to take breaks about every half hour to recline from 15 to 45 minutes at a time, then there would be no competitive employment available. Martsolf's attorney asked about the effect of added limitations of only occasional neck rotation or leaning the head forward or backward. Hastert testified that such limitations would not

5

limit the job she identified. Hastert stated that her testimony was consistent with the Dictionary of Occupational Titles.

### C. Martsolf's self-report and testimony

Martsolf reported that he prepared simple meals, did laundry for himself and his daughter, cleaned the house, drove, shopped for groceries once a week, walked to the mailbox, watched television, talked on the phone with others, and cared for his two cats. Tr. 204-12.

He testified at the December 2014 hearing that he had pain while working at the help desk, sitting in a chair and using his right arm and computer mouse. He has neck pain all the time. Even with his medication, he has to do things at his own speed and lay down on his recliner as needed. He said his pain is controlled as long as he does not do too much, but once his neck is aggravated, he uses the recliner. He can set up web pages while lying on his bed, propped up with pillows. He can drive for about five minutes at a time. He can use a riding lawn mower but it takes a couple of days to recover. He can stand and walk for 15 minutes and lift 20 pounds occasionally. His memory and concentration get worse every year, which embarrasses him. His depression and anxiety are better with medication. He has been offered an injection for his neck by a specialist, who otherwise said his primary care doctor is doing a good job. He said he could not work at his old job because he would be in too much pain simply from having to drive to work. He stated some of his medical records are inaccurate, such as where his doctor failed to note his symptoms.

### D. The ALJ's decision

The ALJ found that during the relevant period, Martsolf had a severe impairment of degenerative disc disease of the cervical spine. Martsolf did not claim to meet any Listings, and the ALJ did not find that he met any.

6

The ALJ found Martsolf has the residual functional capacity to perform:

> [S]edentary work as defined in 20 CFR 404.1567(a) and 416.967(a) pt he can lift 10 pounds occasionally and frequently. He cannot climb ladders, ropes and scaffolds; can frequently balance; can occasionally climb ramps and stairs, stoop, kneel, and crouch. He cannot crawl. He should avoid concentrated exposure to vibrations and hazardous conditions.

Tr. 16. The ALJ concluded Palmer was capable of performing past relevant work as an IT help desk person.

## II. Discussion

Martsolf argues that reversal and remand for award of benefits is necessary because the ALJ improperly assessed his credibility. He further argues that the RFC is unsupported by substantial evidence on the whole record. Specifically, he argues that an SDM's opinion is not proper support for an RFC and that here, the SMD's opinion is the only opinion the ALJ relied on for the physical limitations. He also argues that the ALJ failed to specifically consider his mental limitations, which the ALJ was required to do even if they were non-severe. He adds that although the ALJ gave Dr. Altomari's opinion substantial weight, Dr. Altomari was a non-treating and non-examining consultant, whose opinion was entitled to the least amount of weight. Finally, he argues that the Step 4 determination is unsupported by substantial evidence on the whole record.

The Court's review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Id*. The Court must consider evidence that both supports and detracts from the Commissioner's decision but cannot reverse the decision because substantial evidence also exists

in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015). If the Court finds that the evidence supports two inconsistent positions and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed. *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015).

### A. Credibility determination

Martsolf argues that the ALJ "improper[ly] focus[ed]" on his credibility, in view of a new Social Security Rule. Doc. 15, p. 1.

The ALJ issued the decision denying benefits on January 15, 2015, and concluded in part that Martsolf's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible, for the reasons explained in [the] decision." Tr. 17. The ALJ then explained in detail how he had evaluated Martsolf's statements. *See* Tr. 17-19. Martsolf points to Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, which became effective March 16, 2016, after the date of the ALJ's decision, and superseded the ruling in effect at the time of the decision, Social Security Ruling 96-7p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements. 81 F.R. 14166-01, 2016 WL 1020935; 1996 WL 374186. Unlike SSR 96-7p, SSR 16-3p does not use the term "credibility." Martsolf argues that under SSR 16-3p, credibility is no longer an assessment to be made.

Enactment of the new Ruling does not require reversal. As discussed below, the ALJ's evaluation of Martsolf's subjective complaints under SSR 96-7p, the then-existing ruling, rather than SSR 16-3p did not have a practical effect on the outcome. *Compare Samons v. Astrue,* 497 F.3d 813, 821-22 (8th Cir. 2007) (reversal requires a prejudicial error), and *Welsh v. Colvin,* 765

F.3d 926, 929 (8th Cir. 2014) (where ALJ performed the evaluation required by the applicable SSR, but failed to explicitly cite the SSR, the arguable deficiency in opinion-writing technique "had no practical effect on the decision and therefore [was] not a sufficient reason to set aside the ALJ's decision") (citation omitted).

Both SSR 96-7p and SSR 16-13p direct that evaluation of a claimant's subjective symptoms shall consider all evidence in the record. Both Rulings also incorporate the regulations, 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), that identify factors to be considered in evaluating the intensity, persistence and functionally-limiting effects of the symptoms, including a claimant's daily activities; the nature, duration, frequency and intensity of her symptoms; precipitating and aggravating factors; and the type of medication and other treatment or measures used for the relief of pain and other symptoms, *i.e*., the familiar factors identified in *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1984). But while SSR 96-7p expressly provided that a credibility finding was required to be made under those regulations, SSR 16-3p expressly provides that use of the term "credibility" was being eliminated because the SSA regulations did not use it. 81 F.R. at 14167. SSR 16-3p further provides:

> In [eliminating reference to "credibility"], we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation.

*Id*. SSR 16-3p also expressly provides that the ALJ may not make conclusory statements about having considered the symptoms, or merely recite the factors described in the regulations. Rather,

> The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent, and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

9

*Id.* at 14171.

Here, the ALJ articulated the regulatory factors for evaluating Martsolf's claims about the intensity, persistence and limiting effects of his symptoms, and gave specific reasons for concluding Martsolf's claims were not supported. The ALJ found that the clinical and objective findings in the record were inconsistent with Martsolf's allegation of total debilitation. As for Martsolf's neck, an August 2010 MRI showed cervical disc protrusion and desiccation, and straightening of the normal lordotic curve of the cervical spine. The next month, at the visit with the neurosurgeon, Dr. Gianano, Martsolf reported that he had no neck pain as long as he used his narcotic medication. The doctor noted no numbness, tingling, or weakness. Martsolf's primary care providers occasionally noted neck stiffness or decreased range of motion, but a provider also noted once that Martsolf had better range of motion when not paying attention. Martsolf's psychiatrist noted at least some of his symptoms were triggered by situational stressors. *See Gates v. Astrue,* 627 F.3d 1080, 1082 (8th Cir. 2010) (situational stress is not disabling).

The ALJ also found that Martsolf's conservative treatment history was inconsistent with his allegations of total disability. As for Martsolf's neck, a pain management specialist recommended Advil and neck exercises. Dr. Gianano recommended only conservative treatment: anti-inflammatories, NSAIDs, and physical therapy. Martsolf's primary care physicians prescribed pain medication and exercises. No physician imposed lifting or other exertional restrictions, nor did any note that Martsolf needed to recline during the day. Martsolf's psychiatrist prescribed medications and usually saw him about once every three or four months. Martsolf was never hospitalized nor was it ever suggested to him. *See Lawson v. Colvin*, 807 F.3d 962, 965 (8th Cir. 2015) (holding that if a claimant's pain is controlled by treatment or medication, it is not considered disabling); *see also Milam v. Colvin,* 794 F.3d 978, 985 (8th Cir. 2015) (finding that the ALJ properly considered the claimant's treatment history of exercises and treatment as relatively conservative).

The ALJ also found that Martsolf's activities were inconsistent with his allegations of total disability. Martsolf reported mowing his lawn and using a weed eater. He prepared simple meals, did laundry for himself and his daughter, cleaned the house, drove, shopped for groceries once a week, walked to the mailbox, watched television, talked on the phone with others, and cared for his two cats. Martsolf also reported to his primary care physicians that he felt better when he took his medications, his pain was controlled by his medications, and the pain medications had given him his life back. He even told Dr. Gianino that he did not know why he was at the consultation for his neck because his pain was controlled by his medication. Such inconsistencies between a claimant's subjective complaints and daily activities detract from a claim of disabling pain and support denial of benefits. *Medhaugh v. Astrue,* 578 F.3d 805, 817 (8th Cir. 2009); and *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005).

Martsolf argues that under SSR 16-3p, when considering treatment history, the ALJ should consider one of or more of several factors, including the extent to which the claimant structured his activities to avoid aggravating his symptoms; whether the periodic nature of refills or treatments simply reflect a plateau; whether a claimant takes less medication in order to avoid side effects; whether a claimant takes less medication due to finances; and whether a medical source has advised the claimant that there is simply no other treatment to recommend. Doc. 15, p. 2. Whether Martsolf points to isolated spots in the record that could suggest support for the factors listed, the ALJ's decision regarding credibility of, or the weight given to, Martsolf's subjective complaints is well-supported by substantial evidence on the whole record, including Martsolf's admissions, and therefore will not be disturbed.

Martsolf also notes the ALJ's observation that Dr. Marx at one point described Martsolf's neck pain in terms of "somatic dysfunction." Tr. 17, and 19. Dr. Marx is an osteopath, and in

11

the field of osteopathy, somatic dysfunction is a "defect in structure and/or function, which can be diagnosed by identifying tenderness, asymmetry, restricted motion, and tissue texture changes." http://medical-dictionary.thefreedictionary.com/Somatic+dysfunction.  But, Martsolf says, "The ALJ saw the word 'somatic' and assumed it meant it was all in [Martsolf's] head." Doc. 11, p. 12.  The analysis the ALJ performed considered the entire record; the ALJ did not state that the claim would be denied because "it was all in Martsolf's head."  But even if the ALJ misunderstood Dr. Marx's reference to somatic dysfunction, nothing suggests any such error prejudiced Martsolf.

The ALJ's evaluation of Martsolf's subjective complaints was based on the entire record, reflects consideration of the appropriate factors, and is supported by substantial evidence.

### B.    Formulation of the RFC

Martsolf argues that the RFC is unsupported by substantial evidence on the whole record. The arguments lack merit.

Residual functional capacity is what a claimant can still do despite physical or mental limitations.  20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996).  An ALJ must formulate the RFC based on all of the relevant, credible evidence of record. *See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.") (*quoting Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)).  The RFC determination must be supported by substantial evidence, including at least some medical evidence.  *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000).  Evidence relevant to the RFC determination includes medical records, observations of treating physicians and others, and a claimant's own description of his

12

limitations. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted). The claimant has the burden to prove his or her RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

Substantial evidence on the whole record, including medical evidence, supports the ALJ's determination of Martsolf's RFC. The RFC's provision for sedentary work with a 10-pound lifting and carrying limitation, no crawling, and only occasional bending, stooping, kneeling, crouching and climbing stairs, are consistent with Martsolf's diagnosis of degenerative disc disease, which was treated and well controlled with pain medication. The limitations are also consistent with the fact that no medical records document loss of muscle strength, motor function, or neurologic function, nor reflect that any physical restrictions were ever ordered. *See Hensley v. Barnhart,* 352 F.3d 353, 357 (8th Cir. 2003) (a lack of significant functional restrictions imposed by treatment providers is inconsistent with allegations of disabling limitations). Although Martsolf complained that he sometimes had reduced range of motion in his neck, the vocational expert testified that additional neck-related limitations accounting for reduced range of motion would not prevent Martsolf from performing his past work as an IT help desk person. To the extent Martsolf experiences pain notwithstanding his reports that his pain medication is effective, "inability to work pain free is not sufficient reason to find a claimant disabled." *Martin v. Colvin,* 2013 WL 4060002, at * 20 (W.D. Mo. Aug. 20, 2013) (quoting *Gossett v. Bowen,* 862 F.2d 802, 807 (10th Cir. 1988)). In short, the ALJ considered all relevant, credible evidence of record, and the RFC determination is supported by substantial evidence on the whole record, including medical evidence.

Martsolf argues that the ALJ improperly based his decision on the SDM, even though an SDM is not an acceptable medical source. But the ALJ expressly stated he was not basing his

13

decision on the SDM and in fact, the ALJ's decision is not the same as the SDM's, although the two agree in some respects. Even if the ALJ had based his decision in part on the SDM's, because the RFC is based on substantial evidence on the whole record, without regard to the SDM's opinion, doing so would at most constitute non-prejudicial error that does not merit reversal. *Samons v. Astrue,* 497 F.3d 813, 821-22 (8th Cir. 2007) (reversal requires a prejudicial error).

Martsolf further argues that the RFC is not based on medical evidence including a specific, supporting medical opinion, and the ALJ should have ordered a consultation. As discussed above, an RFC determination must be based on all relevant, credible evidence of record, and must be supported by substantial evidence, including some medical evidence, and the RFC is appropriately supported here. There is no requirement that an RFC be supported by a specific medical opinion. *See Meyers v. Colvin,* 721 F.3d 526, 527 (8th Cir. 2013), and *Chapo v. Astrue,* 682 F.3d 1285, 1288089 (10th Cir. 2012).

Furthermore, a consultation is only required when a crucial issue in the record is undeveloped and the existing medical record does not provide sufficient evidence to determine whether a claimant is disabled. *Buford v. Colvin,* 824 F.3d 793, 797 (8th Cir. 2016). A claimant's failure to provide evidence in support of his claimed work-related restrictions "should not be held against the ALJ when there is medical evidence that supports the ALJ's decision." *Steed v. Astrue,* 524 F.3d 872, 876 (8th Cir. 2008). The record here does not lack medical evidence, it simply lacks medical evidence that is consistent with Martsolf's claimed impairments. Because substantial evidence on the whole record supports the ALJ's decision, the ALJ had not duty to seek additional medical evidence. *Id.* This case is therefore unlike the one Martsolf cites, *Lauer v. Apfel,* 245 F.3d 700 (8th Cir. 2001), in which the Eighth Circuit reversed

14

the denial of benefits when the ALJ himself acknowledged that it was "impossible" to determine the claimant's psychological limitations without a consultative exam, but then failed to obtain and rely upon such assistance.

Martsolf further argues that the ALJ improperly relied on the opinion of Dr. Altomari, the state agency psychologist who concluded that Martsolf had no severe mental impairment. The ALJ gave Dr. Altomari's opinion significant weight, noting it was supported by Dr. Anya's treatment records which reflected Martsolf's symptoms were variable and responsive to treatment. The Social Security regulations explicitly provide that State agency consultants are "highly qualified…experts in Social Security disability evaluations" and that ALJs "must consider" their findings as medical opinion evidence. 20 C.F.R. §§ 404.1513(c), 404.1527€, 416.913(c), and 416.927(e). *See also Mabry,* 815 F.3d at 391 (holding that it was proper for the ALJ to rely on the opinion of the state agency consultant where it was consistent with other evidence).

Finally, Martsolf argues that even non-severe limitations must be considered and the ALJ failed to consider his mental limitations. The argument lacks merit. Martsolf does not challenge the ALJ's conclusion at Step 2 that any mental impairments he had were non-severe. By definition, non-severe impairments result in no more than minimal limitations. 20 C.F.R. §§ 404.1521(a), and 416.921(a); *see also Kirby v. Astrue,* 500 F.3d 705, 707-08 (8th Cir. 2007). No substantial evidence on the whole record suggests that Martsolf had more than minimal limitations caused by mental health issues, let alone any that would have merited the addition of additional limitations to his RFC, nor does Martsolf suggest any limitations that should have been included. Moreover, an ALJ's failure to address a question that should have been addressed does not mandate reversal. Reversal is necessary only if the failure prejudices the

15

claimant. *Samons v. Astrue,* 497 F.3d 813, 821-22 (8th Cir. 2007) (citations omitted). An arguable deficiency in opinion writing technique is not grounds for reversal when that deficiency had no bearing on the outcome. *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir. 1992). Martsolf has failed to show how consideration of non-severe mental health limitations would have caused the ALJ to reach a different conclusion.

It was Martsolf's burden to show he had a more restrictive RFC than the ALJ found and Martsolf did not meet it. Accordingly, the RFC determination will not be disturbed.

### C. The Step 4 determination and Martsolf's ability to do past relevant work

Finally, Martsolf argues reversal is necessary because the ALJ incorrectly found he could perform past relevant work as an IT help desk person. Specifically, Martsolf argues that when he did that job, he essentially sat eight hours a day, whereas the ALJ asked the vocational expert a hypothetical concerning an individual who could stand about two hours per day and sit about six hours per day. Therefore, he concludes, the RFC is inconsistent with his prior job. The argument lacks merit.

The ALJ concluded Martsolf could perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), which describe sedentary work as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

The ALJ then concluded Martsolf could perform his prior past work as an IT help desk person, which is a job that is classified under the DOT as a sedentary one. DOT, App. C § IV, http://www.occupationalinfo.org/appendxc_1.html. Notwithstanding that the ALJ asked a

hypothetical about an individual who could stand about two hours and sit about six hours, the job the vocational expert identified involves sitting almost all the time. In other words, no amount of sitting can exceed the definition of sedentary work. The DOT description of the IT help desk job and the regulatory description of sedentary work are consistent with how Martsolf described his prior job.

Regardless, at Step 4 of the sequential evaluation process, the question is whether a claimant can perform his past relevant work "either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. §§ 404.1560(b)(2) and 416.960(b)(2). Here, the vocational expert stated that her testimony was consistent with the Dictionary of Occupational Titles, and the ALJ concluded Martsolf could perform the IT help desk job as it is generally performed in the national economy. When a claimant has the RFC to perform past relevant work, the claimant is not disabled. *Lowe v. Apfel,* 226 F.3d 969, 973 (8th Cir. 2000).

The ALJ's conclusion at Step 4 is supported by substantial evidence on the whole record.

## III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: January 9, 2017
Jefferson City, Missouri

17

Case 4:16-cv-00348-NKL   Document 16   Filed 01/09/17   Page 17 of 17